IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FIDELITY & DEPOSIT COMPANY OF MARYLAND, | ) ) ) | 8:12CV70 |
| Plaintiff, | ) ) | MEMORANDUM AND ORDER |
| v. | ) ) | |
| CASEY INDUSTRIAL, INC., and SAFECO INSURANCE COMPANY OF AMERICA, | ) ) ) ) | |
| Defendants. | ) ) | |

Casey Industrial, Inc. ("Casey") was the general contractor on a project for the construction of a power plant. Safeco Insurance Company of America ("Safeco") issued a payment bond for the benefit of Casey's subcontractors and suppliers on the project. Topps Mechanical, Inc. ("TMI," "Topps" or "Topp's"), was a subcontractor for piping work on the project. Fidelity & Deposit Company of Maryland ("F&D") issued both a performance bond and a payment bond for TMI's subcontract. After Casey issued a notice of default, F&D provided financial and management assistance to TMI for completion of the subcontract. F&D now seeks to recover damages from Casey and Safeco, based on an assignment of claims from TMI and an alleged right to equitable subrogation.

F&D's complaint contains 7 counts, which may be summarized as follows: (1) a claim against Casey for breach of contract; (2) a claim against Casey for equitable subrogation; (3) a claim against Casey for breach of an implied duty of good faith and fair dealing by failing to disclose to TMI the actual quantity of cold small bore ("CSB") piping that would be required on the project, about which Casey allegedly had superior knowledge; (4) a claim against Casey for constructive acceleration; (5)

a claim against Casey for constructive changes; (6) a claim against Casey for unjust enrichment; and (7) a claim against Safeco on its payment bond.

Casey has moved for partial summary judgment (1) dismissing all claims associated with the alleged scope growth in CSB piping on the project, including Count III, and (2) dismissing Count II (equitable subrogation claim) and capping damages recoverable under the remaining counts to those costs that were incurred directly by TMI, with no recovery for any costs that were paid by F&D. For the reasons discussed below, the motion will be granted only with respect to the CSB piping claims.

### Summary Judgment Standard

Summary judgment is proper when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1130 (8th Cir. 2014). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Heacker v. Safeco Ins. Co. of America*, 676 F.3d 724, 727 (8th Cir. 2012). "As to materiality, the substantive law will identify which facts are material...." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

### Summary of the Parties' Arguments

Casey contends the parol evidence rule defeats the CSB piping claims, and notes there is an integration clause in the subcontract. Casey argues that Nebraska law, which governs the subcontract, does not recognize a "superior knowledge" exception to the parol evidence rule, nor does it impose an implied duty of good faith and fair dealing with respect to contract negotiations (as opposed to performance). In response,

-2-

F&D contends Casey made fraudulent misrepresentations. F&D also argues that the amount of CSB piping required for the project might naturally be the subject of a separate agreement by the parties. Casey objects that F&D did not allege fraud and maintains there is no evidence to support F&D's claims.

Casey contends F&D cannot bring an equitable subrogation claim because it acted as a volunteer, even though Casey had declared that TMI was in default. Casey now claims F&D was not required to act until the subcontract was terminated, which never occurred; Casey also claims F&D is precluded from asserting that Casey breached the subcontract because the performance bond was conditioned on Casey fulfilling its contractual obligations. Casey further claims that F&D cannot recover as an assignee for additional costs that were incurred in completing the subcontract because such costs were paid by F&D instead of TMI. F&D responds that Casey's arguments fail as a matter of law.

### *Undisputed Facts*

This case relates to work performed on the Whelan Energy Center, Unit #2 power plant project located in Hastings, Nebraska, and owned by the Public Power Generation Agency ("PPGA"). Black and Veatch ("B&V") provided the project design and acted as the owner's construction manager for the project. Casey was awarded the contract for mechanical construction on November 7, 2008.

On December 29, 2008, Casey entered into a subcontract with TMI. The scope of work, as defined in Exhibit 3.1 to the subcontract, included, among other items, the "[s]upply and erection of cold small bore piping plus supports" (filing 63-5 at 28). Attached to Exhibit 3.1 is "a 'Division of Responsibility' document which is intended to identify which material/equipment will be installed by which contractor" (*id.*). The document listed numerous specifications and indicated whether they pertained to TMI or Casey, or both. Some of the specifications pertaining to TMI were marked "xx," which was "intended to denote that this pipe is believed to be 'cold small bore'" (*id.*

at 31). It was noted that "Topps must satisfy themselves as to the amount of pipe and fittings required to complete this system" (*id.*).

When TMI prepared its bid for the subcontract work, it estimated that 10,000 linear feet of CSB piping would be needed for the project. The estimate was prepared based on information obtained from B&V, including piping and instrumentation drawings ("P&IDs") and other drawings. TMI placed a "qualifier" in its bid stating that it had "included installation costs for a total of 10,000 feet of 2″ and smaller cold small bore piping" (filing 63-8 at 4). Casey demanded the removal of this qualifier from the bid, and it does not appear in the executed subcontract. The subcontract includes an integration clause (section 32.7), which states:

> This Subcontract embodies the entire agreement of the parties. There are no promises, terms, conditions or obligations other than those contained herein. This Subcontract shall supersede all prior communications, representations or agreements, either oral or written, between the parties.

(Filing 63-5 at 19).

Section 10 of the subcontract required Casey to pay TMI a fixed price for satisfactory completion of all subcontract work; there was no separate pricing for the CSB piping work. According to F&D, the project actually required about 35,000 linear feet of CSB piping, resulting in a cost overrun in excess of $4 million.

Section 16.4 of the subcontract required TMI to furnish a performance bond "in the form and with a surety acceptable to [Casey] per Exhibit 16.4" (filing 63-5 at 12). This was accomplished on February 25, 2009. The performance bond provides in relevant part:

> Topp's Mechanical, Inc., ... herein called Principal, and Fidelity and Deposit Company of Maryland, ... herein called Surety, are held and firmly bound unto Casey Industrial, Inc., .. as Obligee, in the amount of

-4-

... $18,900,927.00 ..., for the payment whereof Principal and Surety bind themselves ... jointly and severally ....

WHEREAS, Principal has by written agreement dated December 29, 2008, entered into a subcontract with Obligee for Whelen Energy Center Unit 2 Mechanical Construction Project ..., which subcontract is by reference made a part hereof, and is referred to as subcontract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if the Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise to remain in full force and effect.

The Surety hereby waives notice of any modification or amendment to the Subcontract made in accordance with the terms thereof, and any alteration or extension of time made by or through the General Contractor.

Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:

(1)     Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;

(2)     Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;

(3)     The balance of the subcontract price ... shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete

-5-

> the subcontract or remedy the default and to reimburse the Surety
> for its outlays shall be paid to the Surety at the times and in the
> manner as said sums would have been payable to Principal had
> there been no default under the subcontract.

(Filing 63-11 at 2).

Section 24 of the subcontact addresses default and remedies. It provides in
relevant part:

> Subcontractor [TMI] shall be in default if it fails or refuses to perform
> any material obligation under this Subcontract on its part to be
> performed. If Subcontractor fails within three (3) business days after
> written notice thereof by Contractor [Casey] to commence and continue
> satisfactory correction of such default with diligence and promptness,
> Contractor shall have any or all of the following remedies:
>
> 24.1    Contractor may complete or perform the Subcontract Work
> ... and charge the cost thereof to Subcontractor ....
>
> 24.2    Contractor may contract with one or more additional parties
> to perform ... and charge all direct and indirect costs thereof to
> Subcontractor ....
>
> 24.3    In the event Contractor elects to perform the Subcontract
> Work or contracts with another subcontractor by virtue of
> Subcontractor's default, Contractor or such replacement subcontractor
> may lake and use any materials, implements, equipment, appliances or
> tools furnished by, belonging or delivered to Subcontractor and located
> at the Project site only if Subcontractor expressly agrees in writing to
> permit such taking and use...
>
> 24.4    Contractor may withhold payment of any moneys otherwise
> due Subcontractor pending corrective action to the extent required by
> and to the satisfaction of Contractor.

> 24.5   If upon a second notice, Subcontractor fails to commence and continue correction of the default within ten (10) business days, Contractor may terminate this Subcontract, in which event Subcontractor shall be liable for the costs of completing Subcontract Work.
>
> 24.6   The foregoing remedies are not exclusive. Contractor shall be entitled to all remedies available at law or equity.
>
> 24.7   Notwithstanding the forgoing, if the event of default would cause work cessation, then Contractor may require that Subcontractor immediately commence and continue correction of the default. Subcontractor's failure to immediately commence and continue correction or the inadequacy of Subcontractor's efforts to cure the default will give Contractor grounds to terminate this Subcontract, in which event Subcontractor shall be liable for the costs of completing the Subcontract Work.

(Filing 63-5 at 15-16).

On November 19, 2009, Casey directed TMI to accelerate its work because it was failing to perform to the project schedule. TMI was advised that should it fail to comply with this directive, "Casey shall, on 11-24-2009, provide notice of default in accordance with Section 24 of the Subcontract" and, "[a]bsent timely cure by Topp's, Casey shall exercise Casey's option under Subsection 24.1" (filing 71-8 at 10). Also on November 19, 2009, Casey sent a letter to F&D advising that "[s]hould Topp's fail to meet the requirements of their subcontract and the notice sent today, Casey will place them in default and be forced to call upon the attached bonds" (*id.* at 8).

On December 10, 2009, Casey sent a "Written Notice of Default" to TMI (filing 63-12 at 2). The notice stated:

> Following the written notice of default delivered to you on November 19, 2009 by Steve Brague, and Topp's continued failure to cure such default in a timely manner (namely recovery of the project schedule), Casey is taking steps to exercise our rights under Subcontract

0803009-01, Section 24, Default and Remedies. Your failure to satisfactorily cure your schedule of work and show any recovery towards the project schedule requirements, the written notice of default and cure from PPGA to Casey, and the recent evidence today of your inability to meet your financial obligations, forces Casey to take the following steps:

1. Per Section 24.1, Casey shall perform the work in the areas as listed in the meeting minutes of December 3, 2009 and charge the cost of such work to Topp's per the rates and mark-up as previously communicated to you on December 10, 2009 at 8:00am, MST.

2. Casey will also send notice to your Surety requesting their immediate participation to satisfy all of Topp's contractual requirements.

Such default and remedies as detailed above, shall in no way cause any work cessation on the part of Topp's Mechanical. Casey fully expects Topp's to work with their surety in an effort to recover their schedule, meet their financial obligations as it relates to this project, and complete all work under this subcontract.

(*Id.*) Casey also sent a letter to F&D on December 10, 2009.  It stated in part:

Topp's has been behind schedule for some time and has continued to progress further behind schedule. Through an ongoing effort of letters, meetings, and other communications, Casey has been requesting from Topp's recovery schedules, cash flow projections, vendor information, and other documents we feel necessary to evaluate their ability to recover the schedule and meet all financial obligations. To date Topp's has failed to meet these requirements. Subsequently, Casey has received a notice of default from our customer PPGA citing the short falls of Topp's as it relates to the schedule. Casey has been placed into a cure period in which Casey must show PPGA our recovery plan, including the work of Topp's.

Due to the ongoing failures of Topp's to provide required progress to meet schedule obligations, the recent letter of default from PPGA to

-8-

Casey, and today's confirmation of Topp's inability to meet their financial obligations (i.e. Casey's last minute advance of payroll in the amount of $670,534.73, which is the 3rd such advance), Casey has officially placed Topp's Mechanical in default of their Subcontract 0803009-01.  Based on information communicated to Casey by Luke Topp, he has been unable to secure adequate financing to cover their projected use of cash.

Casey's further concern also rests in the exposure that this subcontractor brings to them in the area of "liquidated damages".... Thus it is imperative that Topp's and their surety respond timely to the present situation to preclude a default under this subcontract and the impact that will result to Casey Industrial, Inc.

Therefore, Casey is putting you on notice, under the provided performance and payment bonds for the referenced subcontract, of the default and Casey requests that you and your principal respond to any demands by Casey Industrial to fulfill the terms and conditions of this subcontract and address the inability of Topp's Mechanical to meet their payment and performance obligations.

Casey would like to arrange a meeting at the earliest convenience so that we can discuss an appropriate course of action relative to the issue outlined herein....

(Filing 63-13 at 2-3).

On December 16, 2009, Casey sent another letter to F&D regarding an email it received from one of TMI's vendors, indicating that rental equipment being used on the project would be picked up because of nonpayment, and that a mechanic's lien would be filed.  Casey's letter stated that "[a]s Casey has already placed Topp's in default of their Subcontract, Casey demands the Surety to step in and respond immediately" (filing 71-8 at 34).[1]

---

[1] F&D understood the December 16th demand letter to apply to the payment bond rather than the performance bond (filing 63-3 at 9).

In connection with F&D's issuance of the payment and performance bonds in February 2009, TMI executed an "Agreement of Indemnity" which included an assignment to F&D of "[a]ll rights of the Contractor [TMI] in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds" as collateral security (filing 1-5 at 2-3). The agreement also provided that "[i]n the event of any breach or default asserted by the obligee in any said Bonds, ...the Surety [F&D] shall have the right, at its option ..., to take possession of any part of the work under any contract or contracts covered by said Bonds, and at the expense of the Contractor ... to complete or arrange for the completion of the same, and the Contractor ... shall promptly upon demand pay to the Surety all losses, an expenses so incurred" (*id.* at 3).

On September 8, 2010, a "Financing and Collateral Agreement" was executed by TMI and F&D (filing 63-14). In a contemporaneously executed addendum, it was agreed that "[t]he Surety [F&D] will waive its indemnity rights, collection rights, rights to collect amounts deemed to have been loaned to the Principal [TMI]" conditioned upon TMI remaining on the project and not filing for bankruptcy, among other requirements (filing 63-15 at 2-3).

On September 15, 2010, TMI assigned to F&D all of its "right, title and interest in and to any and all monies payable to or received by [TMI] under or in connection with the Subcontract ..., including but not limited to monies earned and to be earned, payment of retained percentages and final payments due or to become due to [TMI] of every kind or nature under the Project, including payment for all extras, claims, requests for equitable adjustments, bonuses, waivers or reductions on assessed liquidated damages and/or damages of any other kind or nature which may be received by [TMI] for the Project and the Subcontract, ... together with all rights of action accrued or which may accrue thereunder" (filing 71-8 at 36).

### *CSB Piping Claims*

-10-

"The parol evidence rule states that if negotiations between the parties result in an integrated agreement which is reduced to writing, then, in the absence of fraud, mistake, or ambiguity, the written agreement is the only competent evidence of the contract between them." *R and B Farms, Inc. v. Cedar Valley Acres, Inc.*, 798 N.W.2d 121, 129-30 (Neb. 2011). "This rule gives legal effect to the contracting parties' intention to make their writing a complete expression of the agreement that they reached, to the exclusion of all prior or contemporaneous negotiations." *Id.* at 130.

The subcontract in this case obligated TMI to "[s]upply and erect[ ] ... cold small bore piping plus supports" (filing 63-5 at 28). No quantity was specified for the CSB piping. It was expressly agreed that the subcontract "supersede[d] all prior communications, representations or agreements, either oral or written, between the parties," and that "[t]here are no promises, terms, conditions or obligations other than those contained [t]herein" (*id.* at 19).

F&D does not allege that the subcontract is ambiguous. *See Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 780 N.W.2d 416, 423 (Neb. 2010) ("A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous."). Nor does F&D specifically allege that the subcontract should be corrected to include additional compensation for CSB piping because of a mutual mistake concerning the quantity required for the project or because of any fraud committed by Casey.[2] *See*

---

[2] Under federal pleading practice, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)). A failure to plead fraud with particularity can result in the dismissal of a claim on a defendant's motion for summary judgment. *See, e.g., Mayer v. Countrywide Home Loans*, 647 F.3d 789, 792 (8th Cir. 2011); *Mitec Partners, LLC v. U.S. Bank Nat. Ass'n*, 605 F.3d 617, 622 (8th Cir. 2010).

*R and B Farms*, 798 N.W.2d at 130 ("A court may reform a written agreement only when there has been either a mutual mistake or a unilateral mistake caused by fraud or inequitable conduct on the part of the party against whom reformation is sought.").

F&D instead alleges Casey breached an implied duty of good faith and fair dealing and claims Casey had "superior knowledge." Specifically, F&D alleges in Count III of the complaint:

> 57. In entering into the Subcontract, Casey impliedly covenanted to act in good faith and to deal fairly with Topps.

> 58. In entering into the Subcontract, Casey was prohibited from doing anything which would prevent, hinder or impede Topps' right to receive the benefit of its bargain under the Subcontract.

> 59. When Topps prepared its bid, it undertook performance without vital information necessary to complete the Subcontract work, which greatly affected Topps' costs of performance.

> 60. At the time Topps prepared and submitted its bid, Casey assured Topps that any risks associated with the actual required amount of linear feet of CSB Piping on the Project would be minimal. Topps had no reason to doubt Casey and otherwise had no knowledge of any information to the contrary and/or any reason to obtain such information.

> 61. The relevant contract specifications and Casey's actions related to the CSB Piping misled Topps, or did not put Topps on notice to inquire further.

> 62. Casey failed to provide Topps with the relevant information related to the total amount of linear feet necessary for completion of the CSB Piping on the Project.

> 63. Topps was damaged by Casey's breach of the implied duty of good faith and fair dealing and failure to disclose superior knowledge.

64. By virtue of the assignment and the Indemnity Agreement, F&D is the proper party plaintiff to bring these claims against Casey.

(Filing 1 at 9-10). Additional allegations pertaining to the CSB piping claims, which are incorporated by reference into Count III, include the following:

15. In late Summer 2008, Topps prepared a preliminary estimate for the Project.

16. Casey advised Topps that Casey would help Topps prepare a bid for the piping work on the Project. Thereafter Casey was actively involved and engaged with Topps in Topps' preparation of its bid. After receiving input by Casey, Topps' estimate was significantly lowered.

17. In order to prepare its bid, Topps requested specific information from Casey related to the Project, Casey provided that information, and Topps relied upon the information.

18. In preparing its bid on the Project and in calculating its anticipated labor and material costs and expenses, Topps relied upon plans and specifications provided by Casey as well as the projected labor rates for construction work undertaken during the period of time identified in Casey's Project schedule.

19. Casey did not provide adequate documentation and information to Topps upon which Topps could estimate the quantity of Cold Small Bore Piping ("CSB Piping") that would be required to complete the Project.

20. Topps' bid for CSB Piping on the Project was based on an estimated need for 10,000 linear feet of piping. Casey assured Topps that any risks associated with the actual required amount of linear feet of CSB Piping on the Project would be minimal. Due to routing requirements on the Project not known to Topps at the time of the preparation of its bid, the actual amount of CSB Piping needed for completion of the Project was in excess of 35,000 linear feet. Casey's failure to provide Topps with information regarding this material fact damaged Topps.

-13-

21. During performance, Topps expended significantly more man hours installing significantly more linear feet of CSB Piping than was anticipated in the Subcontract.

(*Id.* at 3-4).

"The superior knowledge doctrine is a narrow exception to the general rule that contractors in a firm, fixed-price contract assume the risk of increased performance costs." *P & K Contracting, Inc. v. United States*, 108 Fed.Cl. 380, 394-95 (Fed.Cl. 2012). As applied to government contracts, the doctrine generally covers situations where "(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." *Philadelphia Authority for Industrial Development v. United States*, 114 Fed.Cl. 519, 528 (Fed.Cl. 2014) (quoting *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed.Cir. 1994)). "Although the government is not a fiduciary toward its contractors, ... where the balance of knowledge is so clearly on its side ... [it] can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word." *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 778 (Ct.Cl. 1963).

In Nebraska, "[a]s a general rule, a party to a transaction does not have a duty to disclose facts to the other unless there is a fiduciary relationship between the parties." *National American Ins. Co. v. Constructors Bonding Co.*, 719 N.W.2d 297, 303 (Neb. 2006). "[W]here persons are dealing with each other upon equal terms, and no confidential relation exists between them, neither is bound to disclose superior information he may have respecting the transaction, and, *in the absence of fraud or deception to induce the contract*, the courts can afford no relief." *Id.* (quoting *Jones v. Stewart*, 87 N.W. 12, 13 (Neb. 1901) (emphasis supplied)).

-14-

With respect to fraudulent concealment, the Nebraska Supreme Court has followed Restatement (Second) of Torts § 551 (1977) in determining whether a duty to disclose exists. *See Streeks, Inc. v. Diamond Hill Farms, Inc.*, 605 N.W.2d 110, 118-20 (Neb. 2000), *overruled in part on other grounds by Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317 (Neb. 2010).[3] Among other situations creating a duty to disclose, the Restatement provides that "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, ... facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Restatement (Second) of Torts § 551(2)(e) (1977). "Existence of a duty to disclose the fact in question is a matter for the determination of the court, although, if there are disputed facts bearing upon the existence of the duty, they are to be determined by the trier of fact under appropriate instructions as to the existence of the duty." *Zawaideh v. Nebraska Dept. of Health and Human Services Regulation and Licensure*, 792 N.W.2d 484, 496 (Neb. 2011).

The record is devoid of any facts indicating that TMI should reasonably have expected Casey to disclose to it at the time of contracting the quantity of CSB piping that would be needed for completion of the project. The subcontract's "Division of

---

[3] "[T]o prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment." *Knights of Columbus Council*, 791 N.W.2d at 334.

-15-

Responsibility" document even cautioned that "Topps must satisfy themselves as to the amount of pipe and fittings required to complete this system" (filing 63-5 at 31). Although F&D alleges that "Casey was actively involved and engaged with Topps in Topps' preparation of its bid" (complaint (filing 1), ¶ 16), TMI's designated representative testified during a Rule 30(b)(6) deposition[4] that Casey had no involvement in the estimating process for the CSB piping (TMI depo. (filing 63-2) at 16:18-17:6), and that the allegation about TMI lowering its bid after receiving input from Casey does not relate to the CSB piping (*id.* at 27:12-30:9; 45:22-48:7).

Luke Topp explained how the estimate was made: "We took a general arrangement drawing and the P&ID's, which is all we had to work with and took our knowledge that we had as a company and did the linear footage aground the building times the floors, and then that's how we came to the 10,000 linear feet" (*id.* at 17:10-15). TMI had experience bidding similar projects in the same fashion (*id.* at 17:19-20:7). "[I]t was standard practice" (*id.* at 26:4-19). Although the estimate assumed the piping could be routed in straight lines (*id.* at 157:20-158:12), TMI understood it would be responsible for designing the actual routing while on the job (*id.* at 78:21-79:14). As F&D states in its brief: "The actual amount of CSB piping that was necessary for the Project was not fully known until all design drawings and Isometric drawings ("ISOs") were approved by B&V during the construction process (rather than during the initial estimating phase)" (filing 70 at 4). TMI is not aware of either Casey or Black & Veatch performing their own pre-contract estimate of CSB piping quantities (TMI depo. (filing 63-2) at 32:1-12).

F&D alleges TMI underbid its subcontract work because it did not have information concerning the "routing requirements on the Project" (complaint (filing

---

[4] Federal Rule of Civil Procedure 30(b)(6) provides that a party may name a corporation as the deponent and "describe with reasonable particularity the matters for examination." The corporation then must designate one or more persons to testify on its behalf.

1), ¶ 20). Casey allegedly "fail[ed] to provide Topps with information regarding this material fact" and "did not provide adequate documentation and information to Topps upon which Topps could estimate the quantity of Cold Small Bore Piping" (*id.*, ¶¶ 20, 19). F&D does not specifically allege Casey had this information when the subcontract was executed, nor has it produced any evidence to substantiate this essential element of fraudulent concealment.

In fact, TMI's designated representative admitted there is no factual basis for a claim of fraudulent concealment. Luke Topp was asked the following questions and gave the following answers during the Rule 30(b)(6) deposition:

> Q ... Is it the plaintiff's position that there was any information – actual information, facts, that Casey had prior to the date of the subcontract being signed about the actual quantities or the quantities of CSB that they did not share with Topps?
> A I don't understand that question.
> Q Okay. Is it plaintiff's belief that Casey was holding out on Topps and not giving them some information that they had?
> A No, I don't believe so.

(TMI depo. (filing 63-2) at 41:2-11). TMI's position is simply that the P&IDs and general arrangement drawings that were available at the time of bidding did not contain enough information (*id.* at 36:9-37:6).

The evidence also indicates Casey and TMI had equal access to information before the subcontract was signed. Another designated representative, Terry Valentine, testified as follows:

> Q The – during the bid phase, am I right that Black & Veatch conveyed drawings and documents to the parties using basically an FTP site?
> A Yes.
> Q And that's their iBack-up site?

-17-

A If they call it that. All I know is they would put files out there, they'd notify us, and we'd download them off of that.

Q And am I correct that for at least a period of time, Topps had a password to that site and would download the documents themselves, correct?

A That is correct.

Q At some point did at that time change?

A Yes.

Q When was that?

A When the contract [was] signed with Casey. Casey wanted everything – they would download everything, and then they would send us what we needed.

Q So you're saying that you stopped logging directly onto the system – Topps stopped logging directly onto the system after it signed its contract with Casey?

A Yes, because we didn't have user rights anymore.

Q Prior to that, Topps did?

A Yes.

(*Id.* at 173:17-174:17).

F&D speculates that Casey obtained more information from Black & Veatch during a pre-letting meeting in Kansas City, which was also attended by TMI. Luke Topp testified that when the topic of CSB piping came up, he "made the qualifier of 10,000 linear feet," whereupon an unidentified B&V representative "turned ... red, ... jumped up, ... pointed across the room at Rick Lawrence [of TMI], and they both left. A few minutes later they came back in, and we went to – we went to talking about other things" (*id.* at 32:13-33:5). Luke Topp had "no clue" what the B&V representative and Rick Lawrence discussed while outside the room, and they gave no indication of what had been discussed when they returned (*id.* at 33:24-34:15). During their absence, however, another B&V representative may have commented about the 10,000 linear feet estimate. When asked what was said, Luke Topp replied: "I don't recall. They thought it might be light, but they never really said. They just kind of – you know, they didn't want to – they danced around the

-18-

question" (*id.* at 34:16-35:22). "In that meeting they had talked, you know, if 10,000 was enough or not, but, you know, they didn't really know.  They didn't really – you know, they didn't give it a qualifier, and they wouldn't" (*id.* at 33:6-9).

Luke Topp stated that TMI did not revise its 10,000 linear feet estimate after this meeting because "[t]he estimate had already been issued to Casey," which was "one of the two [potential general contractors] left ... on the bid to Black & Veatch or PPGA" and "[a]t that point there was no – no way to change it" (*id.* at 35:23-36:8). Luke Topp then testified about subsequent conversations he had with Casey's representatives concerning the CSB piping and the qualifier of 10,000 linear feet:

> A I had two conversations. One was at the Kansas City meeting in the parking lot with Rick Lawrence.  He asked me about it, and, I said, "You know, it is what it is, Rick, but we've got the qualifier in there of 10,000 feet." And he says, "Well, what if there's more?" I said, "well, if there's more, it's more money, obviously." And he says, "Well, we'll have to leave that in there, I believe, but," he says, "we'll take care of you if there's, you know." He says, "We'll work with you." He said, "Don't worry about it."
>
> ***
>
> A The other conversation was with Steve [Brague] a day or so later. Steve called me.… And he pretty much asked me the same question, and we had the same conversation. I mean, almost to the letter. And Steve, you know, he'd give me the assurance. "I understand that you're nervous about it," but he says, "we'll work with you. Don't worry about it. It's going to be okay." He says that, 'You know, Black & Veatch, obviously, that made them a little nervous, but we're okay with it, and we'll work with it."

(*Id.* at 38:19-40:9).

The foregoing testimony is not sufficient to create a genuine issue of material fact regarding Casey's alleged superior knowledge or fraudulent concealment.  F&D argues that the court "must draw all justifiable inferences related to the hallway meeting between Mr. Lawrence and B&V personnel in TMI's favor" (filing 70 at 15),

but this must be done "without resort to speculation." *Phelps-Roper v. Koster*, 713 F.3d 942, 947 (8th Cir. 2013); *see also Bayside Holdings, Ltd. v. Viracon, Inc.*, 709 F.3d 1225, 1228 (8th Cir. 2013) (to withstand a motion for summary judgment, "[t]he nonmoving party may not rely on mere speculation or conjecture"). It might reasonably be inferred from what Luke Topp witnessed that B&V did not like the 10,000 linear foot qualifier – indeed, Steve Brague evidently told Luke Topp a day or two later that the qualifier made B&V "a little nervous" – but it would be pure speculation to conclude that Casey was informed by B&V that additional CSB piping would necessarily be required for the project.

F&D also claims in its brief that TMI entered into the subcontract as a result of fraudulent misrepresentations.[5] Specifically, it contends "Casey represented to TMI that any risks associated with the required amount of linear feet of CSB piping on the Project would be minimal and that TMI would be taken care of in the event more than 10,000 linear feet of CSB piping was necessary" (filing 70 at 14).

When asked to describe during TMI's Rule 30(b)(6) deposition how Casey had represented that TMI's risks would be "minimal," Luke Topp only referenced the conversations he had with Rick Lawrence and Steve Brague following the Kansas City meeting (TMI depo. (filing 63-2) at 38:10-40:23). As recounted by Luke Topp, however, in neither conversation was a representation made that TMI's risks would be "minimal." F&D also points to a statement allegedly made by Casey's mechanical estimator, John Ramondo, at a meeting in Denver after TMI had developed its 10,000 linear feet estimate. There is evidence Ramondo said that Casey had performed a "comparable job" where 12,000 linear feet of CSB was installed, that TMI's estimate

---

[5] "To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result." *Zawaideh*, 825 N.W.2d at 212.

was "probably pretty close," and that he "would feel comfortable with that number" (*id.* at 30:10-31:10; 165:5-167:2). This individual's thoughts about the accuracy of TMI's estimate cannot provide the basis for a claim of fraudulent misrepresentation. "To constitute a false representation, a statement must be made as a statement of fact, not merely the expression of an opinion." *Kliewer v. Wall Const. Co.*, 429 N.W.2d 373, 380 (Neb. 1988); *see also Fast Ball Sports, LLC v. Metropolitan Entertainment & Convention Authority*, 835 N.W.2d 782, 791 (Neb.App. 2013) ("A fraudulent statement relates to a present or preexisting fact.") (quoting *Linch v. Carlson*, 56 N.W.2d 101, 105 (Neb. 1952) (quotation omitted)).

The alleged representation that TMI would be "taken care of" if more CSB piping was needed for the project is also linked to the conversations Luke Topp had with Rick Lawrence and Steve Brague following the meeting in Kansas City. At the time those statements allegedly were made, however, TMI's bid contained a qualifier of 10,000 linear feet for the CSB piping, and TMI indicated it would demand more money if additional piping became necessary. Casey subsequently demanded that the qualifier be removed, and it was. Luke Topp testified that "the qualifier was in the documents the day before Christmas when we argued about it and finally signed the contract when they talked me out of – talked me into pulling it out" (TMI depo. (filing 63-2) at 52:21-24). He said, "Rick Lawrence wouldn't sign it unless it was gone" (*id.* at 53:16-17). Luke Topp admitted that "during this Christmas Eve conversation, [Casey] didn't say once again that they would take care of anything over 10,000" (*id.* at 54:10-14). Terry Valentine also participated in the Christmas Eve conversation and confirmed that the qualifier was removed by TMI in order to get Casey to sign the subcontract (*id.* at 160:15-161:12). He admitted that as a result "Topps was taking on the risk associated with the quantity of cold small bore being over 10,000 feet" (*id.* at 161:20-162:9). In short, there is no evidence of any misrepresentation.

While "[t]he implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract," *RSUI Indem.*

-21-

*Co. v. Bacon*, 810 N.W.2d 666, 674 (Neb. 2011), Casey's alleged nondisclosures and misrepresentations preceded the execution of the subcontract. "A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract." *Id.* Thus, the covenant only applies to "the performance of a contract." *See id.* "[Casey] could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the [sub]contract was signed." *Scott Timber Co. v. United States,* 692 F.3d 1365, 1372 (Fed.Cir. 2012); *see also Cimino v. FirsTier Bank, N.A.,* 530 N.W.2d 606, 616 (Neb. 1995) ("In order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement.").

Finally, F&D argues that "[c]alculating the total amount of CSB piping after contract execution is the type of agreement that might naturally be made by separate agreement" (filing 70 at 19), and claims this fact creates an exception to the parol evidence rule.[6]  In support of this argument, F&D cites *Traudt v. Nebraska Public Power Dist.,* 251 N.W.2d 148, 150 (Neb. 1977), in which the Nebraska Supreme Court discussed the exception provided in Restatement of Contracts § 240 (1932):

> (1) An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and
>
> (a) is made for separate consideration, or

---

[6] As evidence of a separate agreement, F&D references a February 2009 email from Black & Veatch to Casey that proposed a "Unit Price Quantity Reconciliation Procedure" which was intended to reduce the number of change orders that would be submitted by Casey (filing 63-10). The email does not show there was an agreement between Casey and TMI for additional compensation for CSB piping.

-22-

(b) is such an agreement as might naturally be made as separate agreement by parties situated as were the parties to the written contract.

(2) Where no consideration is stated in an integration, facts showing that there was consideration and the nature of it, even if it was a promise, or any other facts that are sufficient to make a promise enforceable, are admissible in evidence and are operative.

This exception does not apply when the transaction is completely integrated. *See Traudt*, 251 N.W.2d at 150. The subcontract that was entered into between Casey and TMI "embodies the entire agreement of the parties" (filing 63-5 at 19). F&D's claim that TMI was entitled to receive additional compensation for the CSB piping is inconsistent with the express terms of the subcontract.

In conclusion, Casey's motion for partial summary judgment will be granted with respect to Count III of F&D's complaint and any other counts which involve an alleged scope growth in CSB piping. Parol evidence is not admissible to vary the terms of the subcontract under any of the various theories advanced by F&D.

### *Equitable Subrogation Claim*

"The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed.Cir. 1985)). "That is, the surety 'step[s] into the shoes' of the principal obligor and is entitled to all of its rights relating to the construction contract." *Id.* (quoting *Insurance Co. of the West v. United States*, 243 F.3d 1367, 1374 (Fed.Cir.2001)).

More generally, "[t]he doctrine of subrogation includes every instance in which one person pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made under compulsion or for the protection of some interest of the one making the payment and in discharge of an existing liability." *Cagle, Inc. v. Sammons*, 254 N.W.2d 398, 403 (Neb. 1977) (quoting *Sheridan v. Dudden Implement, Inc.*, 119 N.W.2d 64 (Neb. 1962)). "It is well settled, however, that subrogation is never awarded in equity to one who is merely a volunteer in paying the debt of one person to another." *Id.*

F&D apparently expended $16 million in connection with TMI's completion of the subcontract work (filing 63-3 at 4-5).[7] Casey contends F&D acted as a volunteer because it was not legally obligated to remedy TMI's default or provide funds for the completion of the subcontract work until such time as the subcontract was terminated by Casey. In other words, Casey denies that the demand letters it sent in December 2009 triggered the performance bond.

In making this argument, Casey relies on the Fifth Circuit's decision in *L&A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106 (5th Cir. 1994), in which a general contractor ("L&A") sued a subcontractor and the surety ("F&D") on the subcontractor's performance bond for damages arising from the subcontractor's breach of contract. The district court held the subcontractor and F&D were both liable to L&A. On appeal, Fifth Circuit affirmed the judgment against the subcontractor but reversed the judgment against F&D, finding that the subcontractor was not "declared ... to be in default," as required by the performance bond. The evidence showed L&A sent a letter to the subcontractor and F&D in May 1987, stating that the subcontractor had breached the subcontract; the subcontractor was given five days to cure the deficiencies in its performance. The subcontractor's performance improved for

---

[7] An additional $2 million apparently was paid out for claims made under the payment bond (filing 63-3 at 4-5).

several months thereafter. In January 1988, however, L&A sent another letter to the subcontractor and F&D in which it requested "that the Bonding Company take the necessary steps to fulfill this contract to prevent any further delays and costs to L&A." F&D did not respond to the letter and took no action. The subcontractor subsequently completed its work on the project, and at no time did L&A refuse to accept the subcontractor's performance.

L&A, relying on dictionary definitions of "declare" and "default," contended the performance bond only required it to make clear that the subcontractor had failed to fulfill a contract or duty. The Court of Appeals rejected this contention, stating:

> Three factors counsel rejection of L&A's popular dictionary authority. First, L&A's proffered definition misapprehends the legal nature of the "default" that is required before the obligee's claim against the surety matures. Although the terms "breach" and "default" are sometimes used interchangeably, their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract. Usually the principal is unable to complete the project, leaving termination of the contract the obligee's only option. The definition of "default" implicit in L&A's dictionary analogy impermissibly blurs the distinct concepts of "breach" and "default".

> Second, L&A's definition is impractical. A definition of a contract term that leads to impractical or commercially absurd results is unreasonable. Serious legal consequences attend a "declaration of default", particularly in cases such as this case involving multi-million-dollar construction projects. Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals. After a declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee. Given the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety

-25-

that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of its bond. Sureties deprived of a clear rule for notices of default would be reluctant to enter into otherwise profitable contracts. Nothing in the record suggests that the parties intended such an impractical result.

Finally, L&A's definition does not promote the purpose for which the parties probably included a notice of default provision in F&D's bond. That purpose was to avoid the common-law rule that a secondary obligor such as F&D is not entitled to notice when the time for its performance is due. That purpose is not served if L&A can fulfill its duty to provide "notice of default" to F&D by sending letters containing no mention of a default.

*Id.* at 110-11 (footnotes omitted). The Court concluded:

A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, *that the obligee regards the subcontract as terminated*, and that the surety must immediately commence performing under the terms of its bond.

*Id.* at 111 (emphasis supplied).

Similarly, in *Elm Haven Construction Ltd. v. Neri Construction LLC*, 376 F.3d 96 (2d Cir. 2004), the Second Circuit concluded that the surety was not liable on a performance bond because the general contractor ("Elm Haven") failed to declare the subcontractor ("Neri") in default and allow the surety to cure the default before hiring a replacement subcontractor. As in the present case, the performance bond provided that "[w]henever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder, ... (1) Surety may promptly remedy the default ... or (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract ...." *Id.* at 98. Also as in the present case, "[t]he subcontract agreement outlined procedures to be followed in the event of

-26-

a default by Neri. Elm Haven was required to give Neri 72 hours written notice to cure a default, and if Neri did not cure, Elm Haven could perform the work itself, withhold payment from Neri, and/or terminate its subcontract agreement with Neri and hire another subcontractor." _Id._ In other words, "a partial default under the subcontract agreement did not require a termination of that agreement." _Id._

       About two months after work began on the project, Neri and Elm Haven began complaining about each other's performance. Elm Haven sent several letters to Neri, copied to USF&G, detailing its complaints about Neri's performance and failure to respond to inquiries from Elm Haven. It also sent letters to USF&G requesting its "assistance in this matter." Beginning in April, several letters informed USF&G and Neri that certain portions of the work for which Neri was responsible would be performed by others because Neri had either failed to perform, or claimed that it was not contractually required to perform, that work.... On May 17, 2001, Elm Haven contracted with another subcontractor ... to replace Neri. Moreover, two of Neri's sub-subcontractors or suppliers made payment claims against Elm Haven, and one of them filed a mechanic's lien against Elm Haven. Elm Haven paid the lienholder claimant directly, without seeking approval from Neri or USF&G.

       Finally, on June 26, 2001, Elm Haven wrote directly to USF&G, noting that it had been "forced to supplement NERI forces in completing the balance of contract work," that Neri had "virtually abandoned" the project as of April 30, and that Elm Haven had incurred an estimated loss of $942,102. USF&G responded by stating that it was not liable to Elm Haven under the Performance Bond.

_Id._ at 99.

       The Second Circuit affirmed the district court's decision to grant summary judgment to the surety. It stated:

       In order to trigger USF&G's liability under the Performance Bond, two conditions had to be met. First, Neri had to be "in default" under the subcontract agreement, and second, Elm Haven had to "declare[ ] [Neri] to be in default under the" subcontract agreement.

-27-

Such a declaration of default had to be made to USF&G in precise terms. *See* [*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 57 (2d Cir. 2004)] (a "condition precedent to the Sureties' obligations under the Bonds was a clear notice of default terminating the [principal's] rights under the Contracts.")[8]; *L&A Contracting Co.*, 17 F.3d at 111 ("A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond."). In *Braspetro*, this court quoted *L&A Contracting* for the proposition that "'evidence [is] insufficient as a matter of law to establish a declaration of default' where '[n]one of the letters [obligee-general contractor] sent to [principal-subcontractor] and [surety] even

---

[8] The bond in *Braspetro* was in the form of an American Institute of Architects ("AIA") Document A312 Performance Bond. Before the sureties' obligations under the bond could arise, the project owner ("Brasoil") had to satisfy three conditions precedent. "Specifically, Brasoil was required to: (i) notify the Consortium [of contractors] and the Sureties that Brasoil was considering declaring a default and attempt to arrange a conference ... to resolve the situation; (ii) "declare[ ] a Contractor Default and formally terminate[ ] the [Consortium's] right to complete the [C]ontract"; and (iii) agree "to pay the Balance of the Contract Price ... in accordance with the terms of the ... Contract." *Braspetro*. 369 F.3d 34 at 41; *see also Developers Sur. and Indem. Co. v. Dismal River Club, LLC*, No. 4:07CV03148-RGK-DLP, 2008 WL 2223872, *7-8 (D.Neb. 2008) (predicting Nebraska Supreme Court would consider notice provisions of AIA A312 performance bond to be conditions precedent to surety's obligations under the bond). The bond in *Elm Haven* (and the present case) was in the form of an American Institute of Architects Document A311 Performance Bond, which does not contain an express requirement that the obligee formally terminate the principal's right to complete the contract. Indeed, one of the options available to the surety under the AIA A311 performance bond is to "remedy the default," which "would appear to allow the surety to finance the principal in order to remedy the default." William Schwartzkopf, *Prac. Guide Construction Cont. Surety Claims* § 11.02 (2014). The AIA A312 performance bond also allows a contractor to perform and complete the construction contract with financing from the surety following the declaration of default, but only with the consent of the owner. *See id.*

contained the word "default" and where 'other items of correspondence' did not contain an 'unequivocal declaration of default.'" *Braspetro*, 369 F.3d at 57 (quoting *L&A Contracting*, 17 F.3d at 111).

The notice of default requirement of the Performance Bond was not met in this case prior to the June 26, 2001 letter. None of Elm Haven's previous letters "even contained the word 'default'" or an "unequivocal declaration of default." *Id.* At best, the earlier letters notified Neri and USF&G that Elm Haven was exercising its rights under the default provisions of the subcontract agreement. However, the letters clearly evidenced Elm Haven's desire to continue its arrangements with Neri and to keep the subcontract agreement in force. If Elm Haven wanted to trigger the Performance Bond at that point, it would have had to terminate its relationship with Neri and give USF&G an opportunity to complete the project itself or hire others to do so. None of Elm Haven's pre-June 26 letters demonstrates an intent to end its relationship with Neri and allow USF&G to take over the project; to the contrary, these letters provided notice that part of Neri's work would be performed by others, indicating only that Neri would continue to perform some work under the agreement and requesting USF&G's help in improving the ongoing relationship with Neri.

USF&G concedes that the June 26 letter functioned as a declaration of default. By that date, however, Elm Haven had breached its obligation to USF&G under the Performance Bond to give USF&G the option to cure Neri's default. As noted, Elm Haven hired a replacement subcontractor five weeks before declaring default in the June 26 letter, and incurred further payment obligations in hiring replacement subcontractors before actually defaulting Neri. Thus, Elm Haven failed to meet the requirements of the Performance Bond, excusing USF&G from its performance.

*Id.* at 100-01.

The facts of the present case are materially different in two important respects. First, the surety is not contesting its liability under the performance bond; to the contrary, the general contractor is contending the surety acted as a "volunteer" in

performing its obligations under the bond.  Second, Casey's demand letters repeatedly used the term "default."[9]

The subcontract was expressly incorporated by reference into the performance bond. The terms of the performance bond were also specified by Section 16.4 of the subcontract and attached Exhibit 16.4. It is reasonable to assume, therefore, that the term "default" has the same meaning in the performance bond as in the subcontract. "Instruments made in reference to and as part of the same transaction are to be considered and construed together." *McCord & Burns Law Firm, LLP v. Piuze*, 752 N.W.2d 580, 586 (Neb. 2008).

Section 24 of the subcontract defines "default" as TMI's "fail[ure] or refus[al] to perform any material obligation under this Subcontract on its part to be performed" (filing 63-5 at 15). A "default" will provide grounds for termination, but only if it is not remedied within an allotted period of time after notice has been given by the general contractor.  *See* Sections 24.5 and 24.7 (*id.* at 16).

"A surety on a performance bond is bound in the manner and to the extent provided in the obligation." *State ex rel. Wagner v. Gilbane Bldg. Co.*, 757 N.W.2d 194, 200 (Neb. 2008). "There is no language in the performance bond ... which requires termination of the subcontract as a condition precedent to [F&D's] surety

---

[9] Casey notified F&D on December 10, 2009, that it had "officially placed Topp's Mechanical in default of their Subcontract" and requested F&D to "respond to any demands by Casey Industrial to fulfill the terms and conditions of this subcontract and address the inability of Topp's Mechanical to meet their payment and performance obligations" (filing 63-13 at 2). In the written notice of default, Casey stated it was requesting F&D's "immediate participation to satisfy all of Topp's contractual requirements" (filing 63-12 at 2). Six days later, Casey reiterated that had "already placed Topp's in default of their Subcontract" and "demand[ed] the Surety to step in and respond immediately" (filing 71-8 at 34).

obligations arising in the event of a default by [TMI]." *DCC Constructors, Inc. v. Randall Mechanical, Inc*., 791 So.2d 575, 576 (Fla.App. 2001) (interpreting bond language identical to that at issue this case; distinguishing *L&A Contracting*); *see also Nova Cas. Co. v. Turner Const. Co.*, 335 S.W.3d 698, 704 n. 3 (Tex.App. 2011) (refusing to imply termination requirement in performance bond and distinguishing *L&A Contracting* because obligee specifically notified surety of principal's default).

Casey argues that F&D acted as a volunteer because "what F&D sought to avoid by keeping Topps in business was a termination of Topps by Casey that would have resulted in substantially more bond losses" (filing 63 at 29). This argument fails to recognize, however, that the doctrine of equitable subrogation is not limited to situations where a payment is legally required. "The doctrine [also] applies where a party is compelled to pay the debt of a third person to protect his own rights or interest, or to save his own property." *Rawson v. City of Omaha*, 322 N.W.2d 381, 384 (Neb. 1982) (holding that motorist whose vehicle struck pothole and collided with two other vehicles was entitled to reimbursement from city for amounts paid in settlement of personal injury and property damage claims brought by others).

"While it is true that subrogation is never awarded in equity to one who is merely a volunteer in paying the debt of another, one who pays the debt of another in order to protect his own property or interest is not considered a volunteer for purposes of equitable subrogation." *Id.* at 384-85. "The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract and no general rule can be laid down which will afford a test for its application in all cases. The facts and circumstances of each case determine whether the doctrine is applicable." *Id.* at 384.[10]

---

[10] Not all of the facts and circumstances of this case are before the court on Casey's pending motion. For example, it appears that following the December 2009 demand letters there were two in-person meetings in Chicago that were attended by

Casey next asserts that F&D's obligation to perform under the bond was expressly conditioned upon Casey's "having performed [its] obligations [under the subcontract]" (filing 63-11 at 2).[11] Casey argues, without citing any cogent authority,[12] that F&D cannot claim Casey breached the subcontract and at the same time claim a right to equitable subrogation. The "volunteer" rule certainly does not require this result. Indeed, it has been held that "[t]he payment of a claim presented by its obligee is sufficient to entitle a surety to subrogation if it is made in good faith and because of the surety's *supposed* liability on its undertaking." *American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV–05–5155 (SJF), 2007 WL 674691, *8 (E.D.N.Y. 2007) (emphasis supplied).

As a final matter, Casey argues that if F&D cannot claim a right to equitable subrogation, but instead must rely on the assignments that were executed by TMI, then F&D cannot recover any costs it incurred in completing the project because TMI was released from its obligation to indemnify F&D and therefore has suffered no damages. This argument is not adequately developed on either the law or the facts, although Casey suggests the Court of Claims' decision in *Severin v. United States*, 99 Ct.Cl. 435 (1943), should be applied by analogy to limit F&D's recovery. "The [*Severin*]

representatives of Casey, TMI, and F&D (filing 63-3 at 8-9, 14-15). What transpired at those meetings is not evidence. Deposition testimony indicates, however, that F&D promptly hired a consultant to investigate the claimed default and, in February or March 2010, directed the consultant to take over the day-to-day management of the subcontract work (filing 63-3 at 6-7). The consultant's personnel evidently were on site every day thereafter (*id.*).

[11] The bond requires performance by the surety "[w]henever Principal shall be, and be declared by Obligee to be in default under the subcontract, *the Obligee having performed Obligee's obligations thereunder*" (filing 63-11 at 2) (emphasis supplied). Casey's performance of its obligations under the subcontract may be a condition precedent to F&D's obligation to perform under the bond, but even a condition precedent can be waived. *See Pearce v. ELIC Corp.*, 329 N.W.2d 74, 79 (Neb. 1982).

[12] On the other hand, F&D provides no opposing authority.

doctrine holds that a prime contractor may sue the federal government for damages incurred by its subcontractor through the fault of the government, only when the prime contractor has suffered actual damages itself, either because it has reimbursed the subcontractor or remains liable to the subcontractor for those damages." *Contracting Northwest, Inc. v. City of Fredericksburg*, 713 F.2d 382, 385 n. 2 (8th Cir. 1983). The *Severin* doctrine "is based on the federal government's limited waiver of its sovereign immunity for breach of contract and on a federal statute prohibiting assignments of contract claims against the federal government," *id.*, and has no obvious application in the present case.

In conclusion, and for the reasons stated,

IT IS ORDERED that Defendant Casey's motion for partial summary judgment (filing 63) is granted in part and denied in part, as follows:

1.    Count III of Plaintiff's complaint, together with those portions of any other counts which involve an alleged scope growth in cold small bore piping, are dismissed with prejudice.

2.    In all other respects, the motion is denied.

March 19, 2014.                     BY THE COURT:

                                    *Richard G. Kopf*
                                    Senior United States District Judge

_____

        * This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.